# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUDY NUÑEZ,

        Plaintiff,

vs.                                      No.  04cv0041 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Nuñez') Motion to Reverse and Remand for a Rehearing **[Doc. No. 11]**, filed June 2, 2004 and fully briefed on August 9, 2004.  On May 28, 2003, the Commissioner of Social Security issued a final decision denying Nuñez' claim for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Nuñez, now forty-nine years old, filed her application for disability insurance benefits and supplemental security income benefits on February 25, 2002, alleging disability since August 6, 2001, due to rheumatoid arthritis, migraines, muscle spasms, high blood pressure, anxiety, insomnia and chronic pain.  Tr. 15.  Nuñez has a high school education and no vocationally relevant past work experience.  Tr. 15.  On May 28, 2003, the ALJ denied benefits, finding Nuñez' rheumatoid arthritis was severe but did not meet or medically equal one of the

impairments listed in Appendix I, Subpart P, Regulations No. 4.  Tr. 16.  Specifically, the ALJ

reviewed Listing 14.09A (Inflammatory Arthritis).  The ALJ found Nuñez' migraine headaches

and situational depression were not severe because they caused no more than a minimal impact on

her ability to perform basic work functions.  *Id.*  The ALJ further found Nuñez retained the

residual functional capacity (RFC) for light work.  Tr. 21.  Finally, the ALJ found Nuñez' was not

credible.  Nuñez filed a Request for Review of the decision by the Appeals Council.  On

November 25, 2003, the Appeals Council denied Nuñez' request for review of the ALJ's decision.

Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes.  Nuñez seeks judicial review of the Commissioner's final decision pursuant to 42

U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

2

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Nuñez makes the following arguments: (1) the ALJ's finding that her mental impairment was not severe is not supported by substantial evidence and is contrary to law; (2) the application of the Medical-Vocational Guidelines (the grids) is not supported by substantial evidence and is contrary to law; and (3) the ALJ's credibility determination is contrary to the evidence and the law.

## A.  Medical Records

On January 30, 2001, Nuñez went to Presbyterian Medical Group.  Tr. 133.  Nuñez complained of feeling tired, run down, and having body aches and chills.  Dr. Patrick Rivera performed a physical examination which was essentially normal.  Dr. Rivera also ordered laboratory work.  Dr. Rivera noted Nuñez had been started on Atenolol for treatment of her mild hypertension and headaches.  Dr. Rivera also prescribed Fioricett 50 mg for her headaches.  Except for a slightly elevated triglyceride level, all of Nuñez' laboratory work was normal.  Tr. 137, 138.

On July 23, 2001, Nuñez went to Presbyterian Medical Group.  Tr. 132.  Nuñez reported she had fallen at work and injured her left ankle on July 6, 2001.  Nuñez reported she had gone to Anna Kaseman and had x-rays taken.  Nuñez' x-rays were negative.  Nuñez complained that she still had pain even though the swelling had decreased.  Dr. Patrick Rivera diagnosed her with ankle sprain and hand pain.  Dr. Rivera prescribed Ibuprofen 800 mg three times a day, directed her to increase her ambulation and to return in one week.

4

On August 8, 2001, Nuñez went to Presbyterian Medical Group.  Tr. 130.  Nuñez reported to Dr. Patrick Rivera that she was working at Rich Ford and was not feeling well due to her work.  She believed she was being scrutinized at work.  Nuñez reported she was still having pain in her left foot.  Dr. Rivera noted Nuñez was very distraught and was crying.  Dr. Rivera noted Nuñez' left foot was slightly swollen.  Dr. Rivera diagnosed her with (1) Adjustment Disorder with Anxiety and Depression, (2) left ankle strain, and (3) tension headache.  Dr. Rivera prescribed Celexa 20 mg every day for her depression and Xanax 0.25 mg three times a day for her anxiety.  Dr. Rivera also administered an injection of Nubain (for pain) 10 mg and Phenergan 25 mg (combined).  Dr. Rivera directed Nuñez to return in four weeks for a follow-up.

On August 12, 2001, Nuñez went to the ER at Presbyterian Medical Group.  Tr. 157.  Nuñez complained of a migraine headache.  Nuñez reported a past history of "occasional" and "moderate" headaches.  Tr. 158.  Nuñez described her present headache as one of gradual onset and moderate.  *Id.*  Dr. Kennedy ordered a CT of the head, which was normal.  Tr. 159.  Dr. Kennedy prescribed Demerol 25 mg and Phenergan 25 mg, IV (intravenous) which relieved the pain.  Tr. 157.  Dr. Kennedy diagnosed Nuñez as having a "headache."  Tr. 159.

On August 15, 2001, Nuñez went to Presbyterian Medical Group. Tr. 129.  Nuñez informed Dr. Patrick Rivera that she had been out of work since August 9, 2001.   Nuñez reported she continued to have anxiety and headaches.  Nuñez had been seen for a headache on August 12, 2001.  Dr. Rivera noted Nuñez was very anxious about work.  Dr. Rivera strongly recommended Nuñez seek counseling and refilled her Xanax and directed her to continue taking Celexa.

On September 5, 2001, Nuñez went to Presbyterian Medical Group with complaints of headaches and panic attacks. Tr. 128. Dr. Patrick Rivera noted: "Pt has not been able to rtn to work to this point. Has too many issues. Seems to be having what appears to be panic attacks. Headaches are still persistent. Taking multiple meds for issues." *Id.* After reviewing Nuñez' record, Dr. Rivera opined Nuñez was requesting increased amounts of Xanax and Fioricett. Dr. Rivera diagnosed Nuñez with (1) Adjustment Disorder– primarily related to work and (2) Mixed headaches. Dr. Rivera noted he had cautioned Nuñez on regular use of Fioricett and Xanax and had referred her to counseling. Notably, Dr. Rivera opined Nuñez should be able to return to work.

On November 4, 2001, Nuñez went to Presbyterian Medical Group. Tr. 152. Nuñez complained of left ankle pain. The physical examination indicated soft tissue swelling and tenderness with some bruising. Tr. 153. The x-ray of the left ankle was negative. Tr. 156. The nurse practitioner diagnosed her with "sprain L ankle" and prescribed Demerol 75 mg and Phenergan 25 mg I.M. (intramuscular). Tr. 152, 154. Nuñez also received a splint and crutches.

On November 8, 2001, Nuñez went to Presbyterian Medical Group due to an injured left ankle. Tr. 127. Dr. Patrick Rivera examined Nuñez and noted "appears to have had an inversion injury to L ankle on 10/31/01; seen in ER — > x-ray reportedly negative." Dr. Rivera noted Nuñez could bear weight but reported sleeping problems due to the pain. Dr. Rivera's physical examination indicated some bruising of the left ankle with no obvious instability. Dr. Rivera diagnosed Nuñez as suffering from a talo-fibular ligament strain and prescribed Darvocet N 100, one at bedtime. Nuñez declined casting of the ankle. Dr. Rivera advised her to use crutches.

On November 25, 2001, Nuñez went to the ER at Presbyterian Healthcare Services.  Tr. 148.  Nuñez complained that she had a migraine headache.  The attending physician ordered Demerol 75 mg and Phenergan 50 mg I.M.  Nuñez reported she had similar symptoms "one month ago."  Tr. 149.  The attending physician performed a physical examination and noted Nuñez was in mild distress but otherwise the examination was normal.  Tr. 150.  The physician diagnosed her as having a "migraine headache."  *Id.*

On March 4, 2002, Nuñez went to the ER at Presbyterian Healthcare Services.  Tr. 140.  Nuñez complained of "cough, body aches, fever for days . . . and a "migraine headache."  *Id.*  The attending physician ordered Demerol 50 mg and Phenergan 25 mg, Toradol (nonsteroidal anti-inflammatory drug), and Tigan (used in the treatment of nausea).  Tr. 143.   The attending physician diagnosed Nuñez with "viral syndrome-acute."  Tr. 142.

On June 13, 2002, Annette Brooks, Ph.D., a clinical psychologist and agency consultant, evaluated Nuñez.  Tr. 163-165.  Dr. Brooks performed a Mental Status Examination.  Dr. Brooks noted Nuñez was very vague about dates and required persistent and structured questioning in order to obtain a time line.  Tr. 163.  Nuñez reported to Dr. Brooks that she had applied for disability benefits secondary to pain in 1996.  In terms of her pain, Nuñez described the pain as "everywhere . . . even my skin hurts . . . my husband can't touch me."  *Id.*  Nuñez claimed she had pain in her shoulders, head, neck, elbows, and spasms in her jaws.  *Id.*  Nuñez reported that medication did not alleviate her pain, and she managed her pain by avoiding movement and lying down.  Nuñez also reported her mother and brother-in-law, and several friends had been diagnosed with fibromyalgia.  Dr. Brooks noted Nuñez , "resists giving frequency count regarding medications; she states that she will at times take more that (sic) 8 a day, but would not give an

estimate as to how often she required this level of medication."  *Id.*  The psychological evaluation indicated, in part, as follows:

**MENTAL STATUS**
APPEARANCE:  Ms. Nuñez is of average height and mildly overweight; self-reported height and weight were 5'4" and 150 pounds.  She was striking with dark hair (with a few gray strands) worn loose and long below the shoulders.  She was well groomed in black jeans, silver shirt worn open over a black top and black slides.
BEHAVIOR:  She presented as likeable and friendly, though tendencies toward helplessness and dependence, displaying significant pain behaviors, e.g. guarding, grimacing, groaning, shifting positions, antalgic gait.  She was verbal and articulate, answering questions with appropriate elaboration.  She demonstrated ability to understand instructions, sit for 1.5 hours with no breaks, and perform simple tasks.  Ms. Nuñez understood instructions easily and without repetition.  No evidence of intoxication.
MOOD and AFFECT:  mood– "depressed," affect– initially cheerful but became tearful when discussing mood and employment history.
ORIENTATION: fully oriented to person, place, time, and situation.
ATTENTION: mild impairment consistent with depression.  Ms. Nuñez was able to recall 5 digits forward and 4 digits in reverse (age scaled score = 6).
THOUGHT CONTENT and PROCESS: Conversation was logical, linear, and goal directed.  No evidence of underlying psychotic disorder.
SPEECH: volume, pitch, and pace were within normal limits.  Communication was effective; no mispronunciations noted.
JUDGMENT/INSIGHT: within normal limits.  Ms. Nuñez was able to answer social comprehension questions appropriately and demonstrated insight into her situation though her tendency to externalize restricts her problem-solving ability.  Ms. Nuñez responded to social cues appropriately.  She was able to perform simple arithmetic accurately.
PERCEPTIONS:  Ms. Nuñez denied sensory hallucinations.

**PSYCHOSOCIAL ASSESSMENT**
FAMILY OF ORIGIN:  Ms. Nuñez describes childhood as "happy, content" with a supportive and close family.  Her parents are still married and she has 8 siblings.  There is no history of sexual or physical abuse.  Ms. Nuñez has been married thrice and divorced twice; her current marriage is two years old and described as strained.  She has 2 adult children (26, 28) and 8 grandchildren.  She is quite close with her daughter.
LEGAL: creditors and financial issues.
WORK: Ms. Nuñez reports a history of short-term and different positions.  Most of her employment has been through a temp agency and have included switchboard operator, administrative assistant, receptionist, car salesman.  Her longest employment was as a program support assistant at the State Fair for six years.  She was terminated

in 1996 for excessive absences.  She was unemployed 1996-2001.  In 2001 she worked briefly as an administrative assistant but was terminated due to excessive absences and a "hostile work environment."  She has been unemployed since this time.

FINANCES: Ms. Nuñez' husband works at K-Mart and they receive food stamps.

**IMPRESSION**

Ms. Nuñez is a 47 year old married female with multiple pain complaints of unknown etiology and a 20-year history of depression with minimal mental health intervention. Her available medical records are limited and do not include history of work-ups for pain complaints, though by her own report limited work-ups have been negative.  Her sporadic work history predates her pain complaints, and she also describes a pattern of unstable and intense interpersonal relationships.  Ms. Nuñez presents currently with moderate major depression which is exacerbated by lack of structure, financial difficulties, and a strained relationship with her husband.  There is likely a psychological overlay to Ms. Nuñez' physical complaints, i.e., Ms. Nuñez suffers from depression which, by its nature, involves lack of energy, interest, and motivation; however, without a full work-up it is premature to comment on this more conclusively.  **Mild deficits** with concentration and attention are consistent with depression.  Formal mental health intervention is highly recommended– specifically, combination of psychotherapy and psychotropics.  Ms. Nuñez demonstrates capability to manage her own finances.  **It this examiner's opinion, psychological symptoms do not render Ms. Nuñez disabled.  Indeed, it seems likely that a positive vocational experience would benefit depressive symptoms; however, Ms. Nuñez genuinely perceives herself as too ill to maintain employment and is frustrated by the medical community's [failure] to recognize this.**

Tr. 164-165.  Dr. Brooks assessed Nuñez with (1) Major Depression, recurrent, moderate, r/o

pain disorder with psychological (and medical?) factors– pending medical findings; and (2)

Dependent and Borderline Personality Traits.  Tr. 165.  Dr. Brooks also assigned Nuñez a GAF

score of 52.[1]

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR). The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.  A GAF score of 52 indicates moderate symptoms, i.e., moderate difficulty in social, occupational, or school functioning.  *Id.*

On July 18, 2002, Leroy Gabaldon, Ph.D., a psychologist and non-examining agency consultant, completed a Residual Functional Capacity Assessment (Mental).  Tr. 170-172.  Dr. Gabaldon diagnosed Nuñez with Major depression and opined as follows:

> Ms. Nuñez alleges to be impaired due to mental and physical problems.  On the mental portion alone, her assertion of impairment does not appear to be consistent with available clinical and lay evidence.  There is no indication of substance abuse, thought disorder or severe cognitive limitation.  Ms. Nuñez perceives her physical condition to be more limiting than clinical evidence suggests.  Her daily activities are erratic depending on her perceived condition; She is social.  Ms. Nuñez appears to have the capacity to understand/remember and to socialize.  She may have some limitations in her capacity to attend/concentrate and to adapt.

Tr. 172.  On October 3, 2002, Dr. Scott Walker, a psychiatrist, reviewed the records and concurred with this opinion.

On the same day (July 18, 2002), Dr. Gabaldon completed a Psychiatric Review Technique (PRT) form.  Tr. 173-186.  Dr. Gabaldon evaluated Nuñez for Major Depression, Somatoform Disorder (pain), and Borderline Personality Disorder.  Under the "B criteria" of the PRT form, Dr. Gabaldon found Nuñez was **mildly limited** in her activities of daily living and in maintaining social functioning, and was moderately limited in maintaining concentration, persistence, or pace.  Tr. 183.  On October 3, 2002, Dr. Scott Walker reviewed the records and concurred with this opinion.

On July 22, 2002, Dr. Michael P. Finnegan, an agency consultant, reviewed Nuñez' records and noted:

> 47 y.o. woman with a number of issues. She claims to have constant pain in multiple body parts.  Records indicate she has been seen for a variety of routine medical issues. The only ongoing problem of consequence seems to be migraine[s] for which she uses prophylactic medication.  This seems to control them with the exception of flares every 2-3 months which require injectable medications.  She does not appear to have any severe functional deficits.

Tr. 169.  On October 2, 2002, a second physician concurred with this opinion.

On April 15, 2002, Nuñez went to University Hospital.  Tr. 202. Nuñez complained of right shoulder, elbow, arm, and hand pain.  Tr. 202-203.  Dr. Daniel Wascher, Associate Professor of Orthopaedics, evaluated Nuñez.  Nuñez gave a history of having "some pain" in her right upper extremity in October of 2001.  Nuñez reported she had not been able to use her right hand or upper extremity because of the pain.  Dr. Wascher performed a physical examination which was essentially normal.  The x-rays of the shoulder were normal.  Tr. 204.  Specifically, Dr. Wascher found:

> The patient's examination notes full range of motion of her right shoulder.  Actively, she goes up to about 90 degrees.  Passively, I can get her complete full range of motion for all directions which include forward flexion, abduction, external and internal rotation.  Her strength is good for shoulder muscles and she is fine in her deltoid.  She has some subjective pain with palpation, but not specific.  Again, anterior, posterior drawer of the shoulder notes no laxity or dislocation or apprehension.  For her elbow, she has full range of motion.  Again, no crepitans, no instability noted on varus valgus stress.  Her hand examination is also normal in terms of clinical findings.  Her grip examination is also normal in terms of clinical findings. Her grip examination on the right upper extremity was measured four times which measured 4 kg, 6 kg, then 5 kg.  On the left, she was consistently 15 kg.  She has light touch sensation.  Otherwise, radial pulses are excellent.

Tr. 202.  Dr. Wascher diagnosed Nuñez with "right, upper extremity pain of unknown etiology." Tr.  203.  Dr. Wascher prescribed physical therapy for strengthening exercises and range of motion of all joints and Disalcid 500 mg tablet (2) three times a day (nonsteroidal anti-inflammatory agent).  Dr. Wascher directed Nuñez to return in six weeks for a follow-up.

On September 17, 2002, Nuñez went to University Hospital Rheumatology Clinic.  Tr. 195-198.  On that day, Nuñez gave a "long history of chronic joint pain."  Nuñez reported she had pain in her neck, back, jaw, shoulders, elbow, wrists, metacarpophalangeal joints, proximal interphalangeal joints, hips, knees, and ankles.  Nuñez also reported she had "swelling involving

her bilateral metacarpophalangeal joints and proximal interphalangeal joints, as well as her bilateral feets." *Id.* Nuñez was unsure "if her symptoms [were] worsened with activity or when sedentary." *Id.* According to Nuñez, these symptoms had been present for two years. Dr. Arthur Bankhurst, Director of the Division of Rheumatic Diseases and Dr. Chara Solich, Rheumatology Fellow, evaluated Nuñez.

Dr. Solich performed a physical examination which was essentially normal. The musculoskeletal examination revealed the following: "The patient has tenderness involving her metacarpophalangeal joints and proximal interphalangeal joints as well as bilateral elbows. However, she does not have any synovitis on examination. She has good grip strength with full range of motion throughout. There is questionable synovitis involving her bilateral ankles." Tr. 196. Dr. Solich's assessment is as follows:

Assessment and Plan:

1.  Symmetric polyarthralgia: On today's exam, there was not clear evidence of synovitis. However, we suspect that she may have an early rheumatoid arthritis. This was explained to the patient. At this point in time, we will obtain bilateral hand films as well as further serology to help evaluate her condition. As we suspect that she may have early rheumatoid arthritis, we will initiate therapy including Plaquenil 200 mg po bid. The side effects were discussed with the patient. She will need an eye exam every six to twelve months while on this medication. Per the patient's request, we will give her a total of twenty-five tablets of Percocet. However, we will not refill this in the future. She will need to see her primary care physician for any further refills of the Percocet or any other narcotics. Finally, she was given a prescription of prednisone 5 mg tablets that she can take on a prn basis as well.

2.  Fibromyalgia: The patient does have a history of unrefreshed sleep with multiple trigger points on exam. The diagnosis was discussed briefly with the patient. She was given literature about the condition. We would recommend that she perform aerobic exercises as she tolerates. We would suggest to the primary physician to evaluate for potential sleep problems including possible obstructive sleep apnea, if necessary. The patient is currently on Elavil 50 mg po q hs. Other treatment options include Ultram verses Flexeril. However, this may be dictated by her insurance type.

3.  Positive ANA by an outside lab:  Rheumatoid arthritis patients may have a positive ANA.  However, we will evaluate for possible systemic lupus erythematosus with more specific tests.  This was also explained to the patient.

Tr. 196-197.  Dr. Solich directed Nuñez to return in three months.  Tr. 197.

On December 20, 2002, Nuñez returned to the Rheumatology Clinic for her follow-up visit.  Tr. 192-194.  Dr. Najeeb O. Ghaussy and Dr. Wilmer Sibbitt evaluated Nuñez.  Dr. Ghaussy indicated in his report that "patient was felt to have fibromyalgia and possible early rheumatoid arthritis, although no definite diagnosis was given."  Tr. 192.  Nuñez reported the Plaquenil did not help her at all.  Additionally, Nuñez reported the Prednisone helped her but she discontinued it because she was concerned about side effects.  Nuñez complained of "pain all over."  *Id.*  Dr. Ghaussy noted, "Really no specific joint swelling."  *Id.*  The physical examination indicated Nuñez reported significant "tender points, greater than 12 on exam."  Tr. 193.  The laboratory results indicated as follows:

Laboratories– rheumatoid factor 66, ANA negative, DNA negative, SSA and SSB, SMITH negative, compliments normal, RPR negative.  Bilateral hand films were not reviewed since they are not in our clinic; however, no erosions.  No evidence for rheumatoid arthritis per the computer.  CBC normal.  Sed rate 15.  C-reactive proteing 0.5.  BUN and creatinine normal.  Liver function tests normal.  Urinalysis negative.

Tr. 193.  Dr. Ghaussy's assessment was as follows:

Assessment and Plan:  47-year-old female with
1.  Fibromyalgia– patient with definitive tender points on exam.  We will do a trial of Flexeril, 10 mg/po/tid.  The primary care physician can see if this helps, and if it doesn't help, other medicines such as Elavil or Ultram can be tried.
2.  Question of early rheumatoid arthritis – patient with a rheumatoid factor of 66.  Hand films were unable to be located, but per the report, <u>no evidence of rheumatoid arthritis</u>.  She <u>has no active synovitis on this exam nor per the previous doctor in our clinic on 09/17/02</u>.  Thus <u>we cannot make a diagnosis of rheumatoid arthritis at this time</u>.  At this time we would like to obtain a hepatitis panel, repeat C-reactive protein, sed rate.  Repeat the rheumatoid factor as well as obtain a thyroid.  We would also like to obtain a chest x-ray in case, in the future, she does have a diagnosis of

13

> rheumatoid arthritis, we would have that before we start immunosuppressive therapy. The patient was also instructed to get a PPD done through her primary care physician and have the report with her at her next visit; however, given the fact that she has no synovitis at this time and her symptoms seem primary of fibromyalgia, we will go ahead and do the trial of Flexeril at this time; however, in the future we may change the recommendations depending on the above results. She has not had any relief with the Plaquenil and she can discontinue that at this time.

Tr. 193. Dr. Ghaussy noted, "We will <u>follow-up the patient in several months to review the labs and x-rays</u>." *Id.* (emphasis added).

On April 11, 2003, Nuñez submitted a "Medical Assessment Of Ability To Do Work-Related Activities (Physical). Tr. 206-208. A physician completed this form and opined Nuñez could lift no more than 10 pounds due to "hand strength decreased [secondary] effects of arthritis," and could lift this weight "very little, till arthritis under better control." Tr. 206. On the first page, the physician wrote: "Dx: Rheumatoid arthritis many joints affected, now in a flare, elevated levels of inflammation markers in blood test." *Id.* The physician also opined Nuñez "can't stand or sit for long periods [secondary to] getting stiff," and could stand and/or walk without interruption for one hour. Tr. 207. The physician noted Nuñez could never climb or crouch and could only occasionally balance, stoop, and crawl. *Id.* In addition, the physician noted it was difficult for Nuñez to handle and push/pull. Tr. 208. The physician included a comment stating, "poor sleep along with arthritis pain affect clarity of thought, physical and mental stamina." *Id.*

**B. ALJ's Finding of Depression as "Not Severe" at Step Two**

At step two of the sequential evaluation process, the claimant bears the burden to demonstrate that she has a medically severe impairment or combination of impairments that significantly limits her ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c)*;*

14

*see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Eden v. Barnhart*, No. 04-7019, 2004 WL 2051382 (10th Cir. Sept. 15, 2004).  Basic work activities are "abilities and aptitudes necessary to do most jobs," and include the ability to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b)(3)-(6), 416.921(b)(3)-(6).

The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. §§ 404.1520(c), 416.920(c). Although step two requires only a "de minimis" showing, the mere presence of a condition or ailment documented in the record is not sufficient to prove that the plaintiff is significantly limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997).   To meet her burden, Nuñez must furnish medical and other evidence to support her claim.  *Bowen v. Yuckert*, 482 U.S. at 146 & n.5.

The Court has carefully reviewed the record and finds that substantial evidence supports the ALJ's finding that Nuñez' depression did not have a significant effect on her ability to work. There is evidence in the record that Nuñez has been treated for depression; Nuñez also reported she had a long history of depression, specifically, twenty years.  Tr. 165.  However, Nuñez does not claim and the records do not support a claim that depression affected her ability to work during the twenty years that she suffered from depression.  In addition, on September 5, 2001, Dr. Rivera, Nuñez' primary care physician, referred Nuñez for some counseling, but he did not restrict

her from working and there is no record that she sought counseling.  At that time, Nuñez was

working.   Dr. Rivera opined Nuñez "should be able to return to work."  Tr. 128.

On June 13, 2002, Dr. Brooks, a clinical psychologist, performed an extensive

psychological evaluation and opined Nuñez was able to understand instructions "easily and

without repetition," sit for 1.5 hours with no breaks, and perform simple tasks.  Tr. 165.

Significantly, Dr. Brooks opined "psychological symptoms do not render Ms. Nuñez disabled.

Indeed, it seems likely that a positive vocational experience would benefit depressive symptoms;

however, Ms. Nuñez genuinely perceives herself as too ill to maintain employment and is

frustrated by the medical community's failure to recognize this."  *Id.*

An agency psychologist also reviewed Nuñez' records, including Dr. Brook's evaluation,

and opined Nuñez was only mildly limited in her activities of daily living and in maintaining social

functioning and was moderately limited in maintaining concentration, persistence, or pace.  Tr.

183.  Dr. Walker, a psychiatrist, also reviewed Nuñez' records including the psychologist's

findings, conclusions, and opinion.  Dr. Walker concurred with the psychologist's reports (Mental

RFC and PRT form) and his opinion.

Nuñez points out that Dr. Brooks assigned her a GAF score of 52, indicating moderate

symptoms.  However, Dr. Brooks did not explain the GAF score she assigned Nuñez.  Notably,

Dr. Brooks **did not** indicate that Nuñez could not work.  To the contrary, Dr. Brooks was very

clear that "Nuñez' psychological symptoms [did] not render [her] disabled."  Tr. 165.   In fact,

Dr. Brooks opined that working would benefit Nuñez' depression.  *Id.*   Thus, Nuñez' GAF score

does not relate to her ability to work.  The Tenth Circuit has found that a GAF score, standing

alone, without explanation, does not establish an impairment severely interfering with an ability to

perform basic work activities. *See, e.g.*, *Eden v. Barnhart*, No. 04-7019, 2004 WL 2051382 (10th Cir. Sept. 15, 2004)("No one who rated Mr. Eden's GAF indicated that he could not work. Because a score of **50** may not relate to Mr. Eden's ability to work, the score, standing alone, without further explanation, does not establish an impairment severely interfering with an ability to perform basic work activities."); *see also, Cainglit v. Barnhart*, 85 Fed.Appx. 71, 73 (10th Cir. Dec. 17, 2003)(finding ALJ properly found claimant's depression did not significantly limit her ability to work even though she twice received low GAF scores of **45** and **30** where the evidence indicated her depression did not impair her intellectual functioning, she had a good work history and she was able to live independently); *Branum v. Barnhart*, No. 03-7105, 2004 WL 1752411 (10th Cir. August 6, 2004)(finding ALJ properly found claimant did not suffer from a severe mental impairment (depression) where claimant had no limitations with respect to activities of daily living, slight impairment with respect to concentration, persistence, or pace, and no history of decompensation). Therefore, the ALJ properly found Nuñez' depression was not a "severe" mental impairment at step two of the sequential evaluation process.

## C.  Application of the Medical-Vocational Guidelines (the grids)

As a general rule the grids should not be applied  conclusively "unless the claimant could perform the full range of work required of [the pertinent RFC] category on a daily basis and unless the claimant possesses the physical capabilities to perform most of the jobs in that range." *Ragland v. Shalala*, 992 F.2d 1056, 1057 (10th Cir. 1993).  "[R]esort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain." *Id.*  The grids may, however, be used to direct a conclusion if the claimant's nonexertional impairments do not significantly reduce the underlying job base. *See Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.

1995)(holding that the ability to perform a "substantial majority" of work in RFC assessment suffices for purposes of the grids).  This is because only significant nonexertional impairments limit the claimant's ability to do the full range of work within a classification.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

Nuñez contends the ALJ erred in applying the grids conclusively for the following reasons: (1) her mental impairment affects her ability to work; (2) the ALJ's finding that she can perform the full range of light work is not supported by substantial evidence; and (3) the ALJ's finding that her pain is insignificant is not supported by the evidence.  As already noted, substantial evidence supports the ALJ's finding that Nuñez' depression did not significantly limit her ability to work.

The ALJ also found Nuñez retained the RFC to perform light work.  Nuñez argues this is contrary to her treating physician's opinion that she was disabled.  According to Nuñez,  Dr. Robert Ortega, at First Choice Centro Familiar submitted the April 11, 2003 Medical Assessment Of Ability To Do Work-Related Activities (Physical) form.  Pl.'s Mem. in Supp. of Mot. to Reverse at 10.  Nuñez claims the ALJ's reasons for disregarding this opinion is insufficient. Nuñez claims the ALJ  "encouraged [her] counsel to obtain additional information from the treating source" and "[she] did so."  *Id.* at 10.  Nuñez than argues, "[i]f the ALJ was unsure who authored the opinion, he was required to ask for clarification from [her]; he should not be allowed to disregard a critical part of the record."[2]

---

[2] The Court notes that the April 11, 2003 medical assessment from Dr. Ortega is the only clinical record from First Choice.  On February 25, 2002, Nuñez submitted a "Disability Report Adult."  Tr. 86-88.  Under "Section 4- Information About Your Medical Records," Nuñez did not list First Choice as a medical provider.  On July 31, 2002, Nuñez submitted a Reconsideration Disability Report and listed First Choice under "Information About Your Medical Records."  Tr. 117.  Under that section, Nuñez indicated she had visited First Choice on July 26, 2002 and had an appointment to return to First Choice on August 2002.  Nuñez also submitted an undated "Statement When Request for Hearing is Filed and the Issue is Disability"and indicated she had seen a physician at First Choice on October 2002.

Nuñez has the burden of proving her disability which must be the result of a medically determinable physical or mental impairment. *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). Nuñez cannot prevail by merely proving the existence of a condition or ailment. Nuñez must also prove the condition results in some functional limitation on the ability to do basic work activity. *See* 42 U.S.C. § 423(d)(2)(A); *see also, Garner v. Renfro*, No. 00-6077, 2000 WL 1846220 (10th Cir. Dec. 18, 2000)("[T]he operative question for disability benefits under the Act is whether plaintiff experiences <u>functional limitations</u> due to her impairments. Regardless of whether plaintiff could have been diagnosed with a particular medical condtion none of the consultative physicians found her to have functional impairments which precluded the performance of all work . . . .").

In his decision, the ALJ found:

On April 11, 2003, a medical assessment was completed at the University of New Mexico Medical Center. This assessment indicated that the claimant was diagnosed with rheumatoid arthritis, as a result of elevated levels of inflammation markers in her blood tests. It was assessed that the claimant could lift/carry no more than 10 pounds, could do very little lifting occasionally or frequently until the arthritis was better controlled. The assessment also noted that the claimant was unable to stand or sit for long periods of time, indicating 1-2 hours in a workday and 1 hour without interruption. It was further noted that she was unable to climb or crouch but could occasionally balance, stoop and crawl. It was noted that there was some difficulty in handling and pushing/pulling, and that poor sleep due to arthritic pain affected her clarity of thought and her physical and mental stamina as stated in the assessment (Exhibit 13F).

In light of the lack of clinical findings and objective results, it has not been clearly established that a finding of rheumatoid arthritis can be made based on the medical assessment dated April 11, 2003. Further, it is unclear which, if any, acceptable medical source provided the assessment. Because of these inconsistencies found in the record, the undersigned gives less weight to the medical assessment completed on April 11, 2003.

Tr. 18.

19

In her July 14, 2003 brief to the Appeals Council, Nuñez claimed her treating doctor at the University of New Mexico (University Hospital) completed the Medical Assessment Of Ability To Do Work-Related Activities (Physical) form.  Tr. 223 ("The ALJ disregarded the conclusions of Ms. Nuñez' treating doctor at the University of New Mexico who completed the Medical Assessment of Ability To Do Work-Related Activities (Physical).").  However, in her brief to the Court, Nuñez claims "Robert Ortega, M.D., at First Choice Centro Familiar, completed this form (Medical Assessment Of Ability To Do Work-Related Activities) on April 11, 2003, stating that Ms. Nuñez has been diagnosed with rheumatoid arthritis, from elevated levels of inflammation markers in her blood tests."  Mem. in Supp. of Mot. to Reverse at 12.

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  "Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors  provided in [§] 404.1527.'"  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)(quoting Social Security Ruling 96-2p, 1996 WL 374188, at *4).  A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. § 404.1527(d) (1)-(6).  If the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988).  Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the

20

[Commissioner]." *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

Contrary to Nuñez' assertion, the ALJ did not disregard Dr. Ortega's assessment. The ALJ believed a University Hospital health care provider submitted the April 11, 2003 Medical Assessment Of Ability To Do Work-Related Activities. However, because of the "lack of clinical findings and objective results" and because of "inconsistencies found in the record" the ALJ accorded Dr. Ortega's medical assessment little weight. Tr. 18. These are specific and legitimate reasons for according Dr. Ortega's medical assessment little weight.

The rheumatology specialists at University Hospital evaluated Nuñez on September 17, 2002 (Tr. 195-198), and December 20, 2002 (Tr. 192-194). The specialists opined, "patient was felt to have fibromyalgia and possible early rheumatoid arthritis, although <u>no definitive diagnosis was given</u>." Tr. 192. The opinions of specialists related to their area of speciality are entitled to more weight than that of a physician who is not a specialist in the area involved. *See* 20 C.F.R. § 404.1527(d)(5). Significantly, Dr. Solich's September 17, 2002 evaluation indicated Nuñez had an essentially normal examination with "no synovitis on examination," and "had a good grip strength with full range of motion throughout." Tr. 196. Dr. Solich suspected early rheumatoid arthritis. On December 20, 2002, Drs. Ghaussy and Sibbit evaluted Nuñez. Dr. Ghaussy found no synovitis. Dr. Ghaussy assessed Nuñez as possibly having Fibromyalgia and questioned whether she had early rheumatoid arthritis. Dr. Ghaussy did not restrict Nuñez in any way. Dr. Ghaussy noted he and Dr. Sibbit would "follow-up the patient in **several months** to review the labs and x-rays." Tr. 193. Thus, the rhematology specialists' evaluations and their objective clinical evidence do not support Dr. Ortega's opinion of disability.

However, the ALJ misunderstood Dr. Ortega's diagnosis.  In his decision, the ALJ noted: "With Respect to her allegations of rheumatoid arthritis, a laboratory report dated April 9, 2002 from First Choice Alamosa Center indicated a rheumatoid factor reading of 114.  The diagnosis was <u>low severity of Rheumatoid arthritis</u>."  Tr. 17.  The ALJ cited to the "Attending Physician's Statement" used by First Choice to bill patients.  This form also lists the type of visit.  The physician has the following choices: brief, straightforward, low severity, low to moderate, moderate to complexity, high complexity, etc.  Tr. 162.   In this case, Dr. Ortega checked "low severity" to indicate the type of visit not the severity of Nuñez' rheumatoid arthritis.  Nuñez' April 12, 2002 laboratory results indicate she had an Arthritis Profile showing (1) an elevated ESR value; an elevated Uric Acid value, an elevated Rheumatoid Factor, and an elevated Anti-Nuclear Antibodies value.  Tr. 161.  These results corroborate Dr. Ortega's statement that Nuñez had "elevated levels of inflammation markers in blood tests."  Tr. 206.  Although Dr. Ortega did not include his objective findings, he did note on the medical assessment that "many joints "were affected.  Nuñez also failed to submit clinical notes for this visit.  Because the ALJ mistakenly understood Dr. Ortega's diagnosis as "low severity arthritis," which is inconsistent with the restrictions included in Dr. Ortega's medical assessment, the Court will remand this case to allow the ALJ the opportunity to consider Dr. Ortega's medical assessment in light of the Court's findings and redetermine Nuñez' RFC.

On remand, the ALJ should have Dr. Sibbet or Dr. Solich, rheumatology specialists, complete a Medical Assessment Of Ability to Do Work-Related Activities (Physical).  The ALJ should also consult with a vocational expert.  As already noted, the fact that Nuñez may have a diagnosis of rheumatoid arthritis does not determine disability; the question is whether Nuñez

experiences **functional limitations** due to her rheumatoid arthritis which preclude the performance of all work.  The Court expresses no opinion as to whether Nuñez is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result. This remand simply assures that the ALJ applies the correct legal standard in reaching a decision on the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**